**Michael W. BROCKERT, Respondent,**

v.

**Richard SYLER, Appellant.**

**No. WD 61071.**

Missouri Court of Appeals, Western District.

Jan. 28, 2003.

James Armin Rust, Lexington, appellant.

Charles Michael Fitzgerald, Warrensburg, respondent.

Before JAMES M. SMART, JR., P.J., ROBERT G. ULRICH, and RONALD R. HOLLIGER, JJ.

JAMES M. SMART, JR., Judge.

Richard Syler appeals a full order of protection entered against him by the trial court after a hearing on February 5, 2002. The order of protection, issued pursuant to

the Child Protection Orders Act (§§ 455.500 to 455.538), prohibits Mr. Syler, the biological grandfather of E.B., a minor child, from "stalking" or having any contact with E.B. On appeal, Mr. Syler contends, *inter alia*, that the evidence was insufficient to support the granting of the order of protection.

## Factual and Procedural Background

On November 8, 2001, Michael Brockert, the adoptive father of E.B., filed his Petition for Order of Child Protection, alleging that the appellant Richard Syler had stalked his son, E.B. An *ex parte* order of protection was granted that same day. The court held a hearing on February 5, 2002, after which a full order of protection was issued.

Brockert ("Father") is married to E.B.'s biological mother. E.B.'s mother ("Mother") was previously married to Syler's son, who is the biological father of E.B. Father adopted E.B. in 1999, when E.B. was five. E.B., who was eight years old at the time of the hearing, has lived with Father most of his life. At the time of the hearing in this matter, E.B. was unaware that he had been adopted. Prior to the adoption, Father and Mother had requested Syler's cooperation in securing the consent of Syler's son to the adoption by Brockert. Apparently, Syler had cooperated in encouraging his son to consent to the adoption.

E.B. was not present at the hearing. Father testified at the hearing that he first became aware that Syler was engaged in contacting E.B. when he and his wife attended the Thanksgiving program at their son's school on November 6, 2001.[1] At the program, Syler got up out of his seat and walked within a few feet of the front row where the children were standing and took a picture of E.B. "right square in his face." Father observed Mr. Syler taking three or four pictures of his son. It was obvious to Father that E.B. had no idea who Mr. Syler was and that E.B. was "totally terrified" by Syler's actions. E.B. turned sideways during the photographs. Syler continued to make gestures trying to get E.B. to turn around so that he could continue taking pictures. Over objection, Father was allowed to testify that Mr. Syler's taking his son's picture "scared his son to death."

After the program, Father angrily confronted Syler, telling him to leave E.B. alone. Father touched Syler on the arm during these confrontations. Syler, in response, stated that he was E.B.'s grandfather and that he would therefore do what he wanted. At a second heated confrontation, Father suggested to Syler that they settle it outside, but the two eventually parted without any further conflict.

Father related that E.B. had told him that as he was entering his classroom the night of the school program, a woman E.B. did not know (who turned out to be E.B.'s biological aunt) was trying to take pictures of him. E.B. also told Father about an earlier occasion, when he was coming out of the boy's restroom and he discovered Syler near the door to the restroom, which scared him greatly. Also, the child reported that during "sing-alongs" on Fridays at the school, Syler had tried to talk to E.B. E.B. says this scares him, since he does not know who Mr. Syler is.

Father stated that Syler would try to speak to E.B. after the sing-along programs. Father stated that E.B.'s concern

---

1. The testimony of father and others concerning E.B.'s out-of-court statements were admitted over Syler's hearsay objection. The court ruled the statements were admissible under § 491.075. Because of the disposition we reach in this case, we need not address the contention that the trial court erred in admitting this evidence.

is that "[e]very time he turns around at the school, Mr. Syler seems to be in the presence."

Father stated that E.B. is terrified because he now associates the picture taking with the possibility of Mr. Syler stealing him. "That's his biggest fear, somebody is going to steal him ... I just want him to stay away from [E.B.]." Father testified that he had asked the principal of the school to keep E.B. separated from his aunt Allie, Syler's youngest daughter, who attends the same school and is in the same grade as E.B. was. Father stated that eventually he was forced to take E.B. out of that school and put him in a private school.

Mother also testified that she witnessed Syler taking pictures of E.B. at the school program. Mother related that E.B. had asked her who the man was and why he was bothering him. She also related that E.B. told her about seeing him near the bathroom and that Syler had been saying "Hi" to him, calling him by name and waving, when he saw him at the school. She said that E.B. wanted this man to leave him alone. Mother said she told E.B. just to ignore the man.

Richard Syler has two grandchildren (one of whom is E.B.) and a daughter who attend the same school and was in the same grade as E.B. Syler picks up his daughter at the school every day at 3:00 p.m., and every Friday he tries to attend the school sing-along. Syler's daughter was in the group of children at the school program, and also present was another little child who is his grandson (who is also in the same grade.) Syler acknowledged that he had given his camera to his older daughter at one point in the evening and asked her to take pictures of E.B. Syler also acknowledged that he had taken pictures of E.B. at functions on prior school occasions in previous years.

Syler acknowledged that he was outside the children's bathroom when E.B. came out and that he spoke to E.B. when he came out. He acknowledged that he had said "Hi" to E.B. in the hallways and had called him by name, but stated that he knows at least a dozen children by their first names and says hi to them.

The guardian ad litem, Chris Gassen, ("GAL") testified that E.B. feels threatened by Syler since he does not understand why he has singled him out, why he speaks to him, and how he knows his name. E.B. feels that Syler is around all the time and E.B. dreams that Mr. Syler is going to come to his home and take him and his sister out of their beds. The GAL testified that E.B. told her that Syler was coming into the bathroom as he was going out and said to him "Hi, [E.B.]." E.B. told her that when he came out of the bathroom and saw Mr. Syler standing right outside the door, E.B. thought that Mr. Syler was waiting for him to come out of the bathroom. He told her about three Friday sing alongs when Mr. Syler was "always" looking at him and waving at him, and he complained that he does not understand why he is "getting singled out." E.B. also told the GAL about the musical program where the pictures were taken. E.B. informed the GAL that he does not want to go to school any more, that he is afraid to go to the bathroom, that he does not want to go to lunch, and that he does not want to walk in the hallway. The GAL learned from E.B. that he remembered seeing Syler speaking with his mother at a McDonalds' restaurant a couple of times (although he never was informed who Syler was).

The GAL stated that because E.B. does not know who Syler is, he feels threatened by him. Based on E.B.'s fear of Syler, and the fact that there is no plan by E.B.'s parents to tell E.B. who Syler is, the GAL

joined in the request for an order of child protection.

At the close of the hearing, the trial court entered its order barring any contact between Mr. Syler and E.B. The court stated:

> Mr. Syler is not to use, attempt to use or threaten to use physical force against Petitioner that would reasonably be expected to cause bodily injury and shall not stalk, abuse, threaten to abuse, molest or disturb the peace of Petitioner wherever Petitioner may be found. That relates to [E.B.].
>
> He shall have no contact with [E.B.], except as provided by the Court, which is none.
>
> He shall not enter the family premises.

\* \* \*

Syler argues on appeal that the evidence was insufficient to support a finding that he had stalked or harassed E.B. and that the court erred in admitting the hearsay statements of E.B. under § 491.075 RSMo.

### Standard of Review

 As with any court-tried case, the judgment of the trial court will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re A.T.H.*, 37 S.W.3d 423, 426 (Mo.App.2001) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). Substantial evidence is competent evidence from which the trier of fact could reasonably decide the case. *Wallace v. Van Pelt*, 969 S.W.2d 380, 382 (Mo.App. 1998). The reviewing court defers to the trial court's determinations relating to credibility and considers only those facts

and inferences supporting the judgment. *In re R.T.T.*, 26 S.W.3d 830, 834 (Mo.App. 2000). The evidence is considered in the light favorable to the ruling of the trial court.

### Sufficiency of the Evidence

 Syler argues, first, that the evidence was insufficient to support a finding that he had stalked or harassed E.B. Determining whether Syler "stalked" E.B. requires a review of the applicable statutory provisions. Statutory interpretation is a question of law. *Id.* The primary objective of statutory interpretation is to ascertain the intent of the legislature from the language of the statute and, whenever possible, to give effect to that intent. *Van Pelt*, 969 S.W.2d at 383.

Section 455.501(10) defines "stalking" as

> purposely and repeatedly harassing or following with the intent of harassing a child. As used in this subdivision, "harassing" means engaging in a course of conduct directed at a specific child that serves no legitimate purpose, that would cause a reasonable adult to believe the child would suffer substantial emotional distress. As used in this subdivision, "course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of "course of conduct"[.]

 "Purposely" is defined as "by design; intentionally; with predetermination." *Van Pelt*, 969 S.W.2d at 384 (quoting Webster's New Twentieth Century Dictionary 1465 (2d ed. 1979)).[2] Thus, in-

---

**2.** Although *Van Pelt* was a case dealing with the Adult Abuse Act portion of Chapter 455, rather than the Child Protection Orders Act portion of the chapter, the court in *R.T.T.*, 26 S.W.3d at 837, relied upon *Van Pelt* in interpreting "stalking" as defined in

tent is a necessary element of stalking under the statute. *Id.* By using the word "purposely," the legislature has provided that it is the intent of the perpetrator that triggers the statute. *Id.*

■ The evidence must support a finding that the perpetrator has emotionally abused the child by purposely ("by design, intentionally, with predetermination") and repeatedly harassing him ("engaging in a course of conduct directed at a specific child that serves no legitimate purpose, and that would cause a reasonable adult to believe the child would suffer substantial emotional distress"), or following with the intent of harassing him. *R.T.T.*, 26 S.W.3d at 838.

Thus, in order to find that Syler was "stalking" the child, there must be evidence that Syler purposely and intentionally harassed the child or followed him with the intent to harass him. In making this determination, the court must determine whether the perpetrator engaged in "a course of conduct" directed at a specific child. The court must also find that the course of conduct serves "no legitimate purpose." Then, it must be determined whether that conduct would cause a reasonable adult to believe the child would suffer "substantial emotional distress."

■ The term "legitimate purpose," as used in the subsection, has been defined as one that is "sanctioned by law or custom; lawful; allowed." *Id.* Syler's "course of conduct" here was going to a public place, a school that his daughter (and another grandson) attended, either to. pick up his daughter or to watch a school singing program. While there, he often said "Hi" to E.B. He often called the child by name and waved at him. At a Thanksgiving program at which his own daughter was performing, he took the E.B.'s picture and asked a daughter to take his picture.

In order to constitute a course of conduct serving "no legitimate purpose," Mr. Syler's actions must have been such that they are not "sanctioned by law or custom; lawful; allowed." Syler's actions in speaking to his biological grandson, calling him by name, waving at him, and taking pictures of him, are certainly not in themselves either unlawful or uncustomary. Syler was aware that the child did not know that Syler was his grandfather and would therefore not know why Mr. Syler was trying to have contact with him. Syler also apparently knew that E.B. had not been told by his parents that he had been adopted.

By making himself a pronounced presence in the child's life, Syler may have been trying to force the parents to reveal to E.B. that Syler is his grandfather. The parents say they are not prepared to do that at this time for reasons of their own. Thus, Syler was intermeddling in a way likely to be upsetting to E.B.'s parents. With that in mind, it is arguable that the trial court could find that the course of conduct did not serve a "legitimate purpose."

Assuming for the moment, without deciding, that the court could find that the course of conduct served "no legitimate purpose," we move to the next issue, which is whether there was evidence from which the court could find that the conduct would cause a reasonable adult to believe the

§ 455.501(10). The court explained that although *Van Pelt* involved an interpretation of "stalking" under the portion of Chapter 455 relating to adult abuse, there are significant similarities between it and the definition of that term under § 455.501(10). *R.T.T.*, 26 S.W.3d at 837. The court in *A.T.H.*, 37 S.W.3d at 428 n. 3, another case brought under the Child Protection Order Act, also relies heavily upon *Van Pelt*'s definition of stalking, citing the same reason.

child would suffer "substantial emotional distress" as a result of it.

The court in *Van Pelt* stated that "[b]y using the phrase 'substantial emotional distress,' the legislature declared that the offending conduct must produce a considerable or significant amount of emotional distress in a reasonable person; something markedly greater than the level of uneasiness, nervousness, unhappiness or the like which are commonly experienced in day to day living." *Van Pelt*, 969 S.W.2d at 386. "Conduct that merely causes alarm or distress to the victim but which would not cause substantial emotional distress to a reasonable person does not qualify as harassment[,]" the court continued. *Id.*

The statute requires the trier of fact to find that a reasonable adult viewing the conduct would believe that such course of conduct would cause a child to suffer substantial emotional distress. Although there was evidence that Syler, had he been sensitive, should have believed that his conduct was upsetting to E.B.'s parents, we cannot say that it was shown that, prior to picture-taking incident at the Thanksgiving program, Syler had notice that he was upsetting E.B. There was no testimony that either E.B. or anyone else informed Syler that his conduct was distressing E.B. Nor can it be said that a reasonable person would necessarily believe that greeting the child (in a friendly manner), calling him by name, attempting to talk to him, and taking his picture in the presence of his parents and school authorities, would cause the child substantial emotional distress.

There was evidence admitted that Syler's actions *were* causing E.B. distress. However, there is no evidence that Syler had any notice of that fact prior to the picture-taking incident that prompted the filing for a protective order. Syler *now* knows that his actions caused E.B. fear and distress, but there is no evidence that he knew it before Brockert confronted him and then sought the *ex parte* order (or at least before E.B. acted uncomfortable at the program).

In *R.T.T.*, the court found that there was insufficient evidence of stalking because the evidence clearly showed that the contact between the child, a sixteen-year old female, and the alleged perpetrator, a twenty-year old male, was consensual. 26 S.W.3d at 838. Here, the contact between E.B. and Syler was far from consensual, but it was not shown to have been clear to Syler prior to the Thanksgiving program, and prior to E.B.'s response of appearing uncomfortable about the picture-taking, that Syler's conduct may have been causing emotional distress. This one occasion of taking pictures could hardly be called a "course of conduct." The evidence thus does not show that Syler "purposely and repeatedly harassed" E.B., or that he had followed E.B. with the intent of harassing him. *A.T.H.*, 37 S.W.3d at 428. *See* 455.501(10).

For the foregoing reasons, we conclude that there was insufficient evidence to support the order of child protection entered in this case. Because we reach that conclusion, it is unnecessary to address the issue of the admissibility of the child's alleged out-of-court statements.

## Conclusion

For the foregoing reasons, the order of protection is reversed.

ULRICH and HOLLIGER, JJ., concur.